CARSON v. EISNER et al.

(Supremè Court, Appellate Division, First Department. June 9, 1899.)

FRAUD—SUFFICIENCY OF EVIDENCE.

In an action by a stockholder of an advertising company against other stockholders for fraudulently inducing him to sell his stock for much less than actual value, the testimony showed that the larger portion of the company's business was advertising goods sold by defendants; that defendants represented to plaintiff that they were not satisfied with the condition of the business of the company; that they were going to withdraw their advertising, and wind up the company. They offered to buy his stock for a sum equal to the value of the company's assets; and plaintiff, believing that if he did not accept their offer his stock would be worthless, sold it. About a month later defendants sold the stock to a third person, with whom plaintiff had been negotiating before the sale of his stock, but it was not shown that it was a part of the original negotiation, or that they desired to obtain plaintiff's stock in order to sell it, or that they concealed anything from him. *Held,* that the evidence was insufficient to show fraud.

Appeal from trial term, New York county.

Action by Joseph P. Carson against Moritz Eisner and another. From a judgment for plaintiff entered on the verdict of a jury, and from an order denying a motion for a new trial, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

Dundan Edwards, for appellants.

John S. Wise, for respondent.

PATTERSON, J. Although the complaint in this action seems to have been framed with the view of charging the defendants with the conversion of certain shares of stock, the property of the plaintiff, yet there are allegations contained in it to the effect that the defendants, by fraud and deceit, induced the plaintiff to sell to them the shares at a price much less than their actual value. The case was tried, and went to the jury on issues, as an action for deceit. The plaintiff had a verdict, and from the judgment entered thereon, and from an order denying a motion for a new trial, the defendants appeal.

Viewed as an action for deceit, the issues between the parties were clearly defined by the court in charging the jury, and the rules of law on the general subject of liability applicable to those issues were correctly stated. The decisive inquiry now is whether, within those rules and on the proven facts, the plaintiff was entitled to a verdict. After repeated readings of the record, we can reach no other conclusion than that the verdict is against the whole current of the evidence on the issue of fraud and deceit of the defendants in procuring the shares. The imputed fraud is based altogether upon alleged false representations. The leading facts of the case are plain. In the latter part of 1894, the plaintiff was the owner of 60 shares of the capital stock of a corporation called the Cosmopolitan Advertising Bureau. The entire capital of that company was nominally $30,000, represented by 300 shares. The

corporation had been organized by the defendants. Its business was that of an advertising agency, and nearly all of the receipts of that business were derived from advertisements of various articles sold by the defendants in their co-partnership business. Indeed, it appears that the Cosmopolitan Company was organized by the defendants as a means of enabling them to economize in their advertising. Of the whole amount of capital stock, only $3,000 was ever paid in, and at the time of the sale of the plaintiff's shares to the defendants its tangible assets were worth about that sum. The plaintiff bought his shares from one Page, and paid him therefor the par value thereof. Prior to December, 1894, the plaintiff had become the president of the corporation. At about that time the defendants, who had the controlling interest, were dissatisfied with the situation of the business, and desired to extend it by bringing in other advertisers as customers. The business had been prosperous, and dividends had been declared for two years,— one year the dividend being 8 per cent., and the other 10 per cent.; but those dividends were earned principally and almost entirely from the advertising furnished by the defendants. The plaintiff shared the defendants' desire to expand the business, and undertook to negotiate with third parties (advertising agents) to induce them to come into the Cosmopolitan Company with the business controlled by them. To that end he entered upon negotiations with one Haulenbeck, who was largely engaged in business as an advertising agent, and there were, down to April, 1895, conferences had between Carson and Haulenbeck, of which the defendants were aware, and which it was their wish to have consummated by an agreement. During the progress of those negotiations with Haulenbeck, but at what particular time does not clearly appear, a draft memorandum was made expressing the understanding as between the plaintiff and the defendants of the terms and conditions upon which Mr. Haulenbeck would be admitted to the company; but that paper was never signed, nor were its terms ever adopted. The plaintiff swears that those terms were, in effect, acquiesced in by Haulenbeck, but the latter denies it. In that memorandum it is stated:

"Mr. H. shall come into the company on the ground floor, namely, 10 per cent. of $20,000, to be paid into the treasury of the Cosmopolitan Company, whose capital stock shall be increased to $50,000. Mr. H. to bring into it business of $150,000, in consideration of which the above stock shall be issued to him, and he also shall receive a salary of $5,000. He shall be allowed to draw on account of said salary at the rate of $416.66 a month, provided the amount of business turned in amounts at the rate of $150,000 per annum. He shall also be entitled to one-third of the gross profits of all business he turns in over and above the stipulated sum of $150,000; the stock to be delivered to him at the end of one year, and the 10 per cent. to be paid thereon is also to be paid for upon the delivery of said stock. All dividends during the year to accrue to the benefit of said stock, which shall remain in escrow in the treasury during that time. Mr. H. shall be elected president of the company, and one share to be assigned to him at once for this purpose. If, after the delivery of the $20,000 stock, it shall be considered advisable to change the name of the company, there shall be no objection raised thereto. It is also agreed that Mr. Carson shall receive a salary of $208 a month, provided the company does a total business at the rate of $250,000 per annum, and that Mr. H. will accept the foregoing

proposition, based on one-third of the earning on business brought in by Mr. H. Mr. Carson shall also receive one-third of the commission earned on business brought in by him."

That memorandum contains a statement of the terms and conditions of an agreement which the plaintiff and the defendants were willing, at the time, to make with Haulenbeck, and it was undoubtedly upon the lines of that memorandum that Carson was working in his efforts to bring in Haulenbeck. One of its principal features is the provision which relates to Carson's personal interest in the company, and securing to him a salary and commissions upon business procured by him. The proposition to bring in Haulenbeck was made, according to the plaintiff's statement, in the latter part of the year 1894. Whether this draft memorandum was made at or about that time does not appear. About the 1st of May, 1895, the plaintiff left the city of New York, and was absent a few weeks. When he went away he understood that the terms of an arrangement with Haulenbeck, as embodied in the memorandum, would be carried out. He returned to the city of New York about the 26th of May, 1895, and was then informed that the arrangement had altogether failed, whereupon he had interviews with the defendants, particularly with Eisner. He swears (and this testimony contains the substance of his charge of deceit and fraud) that the defendants told him:

"This deal between Mr. Haulenbeck and the advertising company had failed by the withdrawal of Mr. Haulenbeck from any negotiations in the matter, and they said—they told me, Mr. Eisner and Mr. Mendelson together, Mr. Eisner being the mouthpiece always—they were tired of the situation in that company. * * * Mr. Eisner stated to me that they were tired; that he and Mr. Mendelson (and Mr. Mendelson was present) were tired of the situation in the company; that they had for some time past thrown the great bulk of business into the Cosmopolitan Advertising Company; that they had concluded now, since this deal with Haulenbeck was off, * * * that they were going to withdraw their account from the business, * * * and they said that, out of consideration for me [the plaintiff], as I had worked very hard for this thing, * * * they had concluded to give me the equivalent of the assets of the company. * * * The company had loaned me, by direction of the defendants, $1,350. I gave my note to the company for it, and they agreed, if I would consent quietly to closing the company up, that they would return my note to me, giving me $900 each, in addition,—making the sum total of $3,150, which I would receive for my stock. I understood that they were able to close the company up. They were a majority of the stockholders, and I believed that they would do it without a doubt, and I knew that they could withdraw their business from the company if they concluded to."

On the 29th of May, the plaintiff, as he says, induced by the statements and representations of Eisner, and in the belief that the defendants would withdraw their business and close up the company, went to the defendants' office, and sold them the stock on their terms, and assigned it in blank. He received the note he had given for the loan, and a check from Mr. Eisner for $900, and another check from Mr. Mendelson for the same amount.

The whole effect of the plaintiff's testimony and of his claim is, thus far, that the defendants, through Eisner, represented to him that Haulenbeck had absolutely retired from the transaction, and would not enter into the company; that they were tired of the sit-

uation, and would close up the business of the company; that out of consideration for him, and in view of what he had paid for his stock, they would purchase it from him at a certain price; and then his understanding was that they would go on and close out the company; and that it was in view of that situation that he sold his shares. The burden of proof was, of course, upon the plaintiff to prove the falsity of the representations that were made by Eisner and Mendelson. His contention is that those representations were false because an arrangement was made between Haulenbeck and the defendants in June, 1895, upon the basis of some of the terms contained in the draft memorandum of the agreement as above set forth. The facts upon which the case depends relate to the withdrawal of Haulenbeck from negotiations founded upon the contemplated arrangement the defendants and the plaintiff were willing to make, as stated in the draft memorandum. The plaintiff called Haulenbeck as a witness, who positively testified that in April, 1894, he declared to the defendants that he would not enter into the Cosmopolitan Company's business, or have anything to do with it in conjunction with the plaintiff. As we have seen, one of the terms of the plaintiff's negotiation was the allowance to him of a salary and commissions. That was a prominent term of the arrangement he stands on,—the agreement he sought to have made. According to the testimony of Haulenbeck, the plaintiff's own witness, the representation of Eisner that Haulenbeck had retired from those negotiations was absolutely true. Haulenbeck would not be associated with Carson. Thus the matter had fallen through, and when, on or about the 26th of May, Eisner told Carson that such was the situation, he told the truth. It remains, then, to consider whether the defendants made any other representations concerning the situation of their dealings with Haulenbeck which were false representations, or, to go further, perhaps, than is necessary, whether they suppressed any information which Carson should have had imparted to him before he parted with his stock to them. The claim of the plaintiff, on this record, is that the defendants represented that they were tired of the situation; that they were going to withdraw their business from the company, and wind it up; that they were willing to pay to him a certain sum for his stock; and that upon those representations, believing that if he did not accept their offer his stock would be rendered worthless, he parted with it at the price offered by them. He claims that those representations were false, that the defendants did not intend to wind up the business, but that they desired to obtain his stock, in order that they might make or conclude some arrangement with Haulenbeck by which they could make their own shares valuable by selling them to Haulenbeck with those acquired from the plaintiff, and give to Haulenbeck the entire ownership or control of the company. In support of this view, the plaintiff read in evidence the minutes of a meeting of the stockholders of the company held on the 11th of June, 1895, at which were present the defendants, Eisner and Mendelson, and two other stockholders, 291 out of the 300 shares being represent-

ed. At that meeting Eisner stated that Haulenbeck was desirous of purchasing 200 shares of the treasury stock at its par value, and the sale was authorized. The minutes of the meeting state that it was moved and seconded that Messrs. Eisner and Mendelson be elected a committee of two to consider a proposition submitted by Mr. Haulenbeck as to his doing all of his advertising business through the Cosmopolitan Advertising Bureau, and that Mr. Eisner and Mr. Mendelson retired from the meeting to confer with Mr. Haulenbeck, and that Mr. Eisner returned and reported that Mr. Haulenbeck stated that he would unite his best efforts in working with the Cosmopolitan Advertising Bureau, and would do all his advertising with the company upon receiving or being allowed an agreed commission on all his business turned into said company, in addition to the sum of $18,000, which he exacted as a compensation for devoting his best energies to the working of the company and for doing his advertising business through the agency of the company; the sum of $18,000 to be credited to him on the books of the company on account of the amount due on purchase of the 200 shares of treasury stock. The minutes then state that Mendelson said that he had examined into the accounts and business of Haulenbeck, and it was his opinion, as well as that of Eisner, that such a proposition would be of the greatest advantage to the company, and stated fully his reasons therefor. He moved that the proposition submitted by Haulenbeck be accepted by the company, and the directors of the company be fully empowered and authorized to close and consummate the deal with Haulenbeck, which was carried.

The position of the plaintiff is that the proceedings had at this meeting show that there was a transaction between Eisner, Mendelson, and Haulenbeck which was substantially carrying out the terms of the memorandum agreement above recited, and that an inference is justified therefrom that the assertion that Haulenbeck had retired from the transaction negotiated by the plaintiff was a subterfuge and a mere method of excluding the plaintiff from any participation in, or benefit from, the transaction; or, to adopt the expressive phrase used through the record, "freezing the plaintiff out." There are some points of resemblance between the terms of the arrangement contained in the minutes of the stockholders' meeting and the terms as stated in the draft memorandum of agreement first referred to, but the testimony of Haulenbeck is positive, to the effect that no conversations, negotiations, or correspondence were had between himself and Eisner or Mendelson between April, 1895, and June, 1895. Haulenbeck says he never saw Eisner or Mendelson, or communicated with them in the matter of Carson's negotiations at any time from December. 1894, to June, 1895, except at the time he told Eisner that he would have nothing to do with Carson (which was in April, 1895), and he says that he never communicated with them again until Mr. Fowle came to him in June, 1895, in regard to the affairs of the bureau. Fowle was the party through whom, the defendants swear, negotiations were resumed, in June, with Haulenbeck. The whole drift of the testi-

mony is that Haulenbeck abandoned negotiations which included Carson in any way as a party interested, and did not resume them until after the plaintiff sold his shares to the defendants. It is shown that, as a matter of fact, the representation that the defendants were tired of the situation was true. That is an inevitable conclusion from the whole testimony. There is nothing to show that it was false that they had concluded to wind up the company at the time they made their purchase of the plaintiff's stock. It is not shown that they had an ulterior purpose connected with Haulenbeck at that time, or that they were misrepresenting or concealing anything from the plaintiff. The intention to close up the company may have been honestly entertained, and only relinquished when Fowle appeared and resumed negotiations with Haulenbeck. The minutes of the stockholders' meeting show that the proposition laid before that meeting was a new one, originating with Haulenbeck,—a proposition made as coming from him,—and there is not one word to indicate that there was complicity between Haulenbeck and the defendants in giving a false appearance to that proposed transaction. But, although sanctioned at the meeting of the stockholders, it was never carried out. An entirely different arrangement was made, by which Haulenbeck purchased all the stock, by paying for some and securing an option on the remainder, which option was subsequently exercised, and Haulenbeck became the sole proprietor of the business, the defendants selling to him the stock they acquired from the plaintiff at less than they paid for it. The fraud and deceit charged by the plaintiff were not proven.

The judgment and order appealed from must be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur.